1
2
3
4

UNITED STATES DISTRICT COURT

5

DISTRICT OF NEVADA

6

* * *

7

COLETTE JOHNSON,

Case No. 2:12-cv-01438-APG-PAL

8

Plaintiff,

REPORT OF FINDINGS AND
RECOMMENDATION

9

v.

10

CAROLYN W. COLVIN,

(Mtn to Reverse – Dkt. #25)
(Cross Mtn to Affirm – Dkt. #29)

Defendant.

11

12       This case involves judicial review of administrative action by the Commissioner of Social

13   Security denying Plaintiff Colette Johnson's claim for disability benefits under Titles II and XVI

14   of the Social Security Act (the "Act").

15                                    **BACKGROUND**

16       On February 23, 2010, Plaintiff filed concurrent applications for a period of disability,

17   disability insurance benefits, and Supplemental Security Income ("SSI"), alleging she became

18   disabled on June 1, 2009.  AR[1] 136-149.  The Social Security Administration ("SSA") denied

19   Plaintiff's applications initially and on reconsideration.  AR 65-78, 83-86, 91-96.  A hearing

20   before an administrative law judge ("ALJ") was held on June 21, 2011.  AR 33-64.  In a decision

21   dated July 1, 2011, the ALJ found Plaintiff was not disabled.  AR 19-27.  Plaintiff requested

22   review of the ALJ's decision by the Appeals Council.  AR 14-15.  The ALJ's decision became

23   the Commissioner's final decision when the Appeals Counsel denied review on June 15, 2012.

24   AR 1-5.

25       On August 14, 2012, Plaintiff filed an Application to Proceed In Forma Pauperis (Dkt.

26   #1) and submitted a Complaint (Dkt. #4) in federal court, seeking judicial review of the

27   _____

[1]AR refers to the Administrative Record, which was delivered to the undersigned upon the

28   Commissioner's filing of her Answer (Dkt. #21) on April 25, 2013.

1

1   Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The Commissioner filed her Answer

2   (Dkt. #21) on April 25, 2013.  Plaintiff filed a Motion for Remand (Dkt. #25) on May 28, 2013.

3   The Commissioner filed a Cross-Motion for Summary Judgment and Opposition (Dkt. #29) on

4   July 29, 2013.  The court has considered the Motion to Remand and the Cross-Motion and

5   Opposition.

6                                    **DISCUSSION**

7   **I.      Judicial Review of Disability Determination.**

8           District courts review administrative decisions in social security benefits cases under 42

9   U.S.C. § 405(g).  *See Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  The statute

10  provides that after the Commissioner of Social Security has held a hearing and rendered a final

11  decision, a disability claimant may seek review of the Commissioner's decision by filing a civil

12  lawsuit in federal district court in the judicial district where the disability claimant lives.  *See* 42

13  U.S.C. § 405(g).  That statute also provides that the District Court may enter, "upon the

14  pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the

15  decision of the Commissioner of Social Security, with or without remanding the cause for a

16  rehearing."  The Ninth Circuit reviews a decision of a District Court affirming, modifying, or

17  reversing a decision of the Commissioner de novo.  *Batson v. Commissioner*, 359 F.3d 1190,

18  1193 (9th Cir. 2003).

19          The Commissioner's findings of fact are conclusive if supported by substantial evidence.

20  42 U.S.C. § 405(g); *see also Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005).  However, the

21  Commissioner's findings may be set aside if they are based on legal error or not supported by

22  substantial evidence.  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006);

23  *see also Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The Ninth Circuit defines

24  substantial evidence as "more than a mere scintilla but less than a preponderance; it is such

25  relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

26  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Bayliss v. Barnhart*, 427 F.3d

27  1211, 1214 n. 1 (9th Cir. 2005).  In determining whether the Commissioner's findings are

28  supported by substantial evidence, the court "must review the administrative record as a whole,

weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *see also Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

Under the substantial evidence test, the Commissioner's findings must be upheld if supported by inferences reasonably drawn from the record. *Batson,* 359 F.3d at 1193.  When the evidence will support more than one rational interpretation, the court must defer to the Commissioner's interpretation.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also Flaten v. Sec'y of Health and Human Serv.,* 44 F.3d 1453, 1457 (9th Cir. 1995).  Consequently, the issue before the court is not whether the Commissioner could reasonably have reached a different conclusion, but whether the final decision is supported by substantial evidence.

It is incumbent on the ALJ to make specific findings so that the court does not speculate as to the basis of the findings when determining if the Commissioner's decision is supported by substantial evidence.  Mere cursory findings of fact without explicit statements as to what portions of the evidence were accepted or rejected are not sufficient.  *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981).  The ALJ's findings "should be as comprehensive and analytical as feasible, and where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Id.*

## II.   **Disability Evaluation Process**

The claimant has the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant must provide "specific medical evidence" to support his or her claim of disability.  If a claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy.  *Batson*, 157 F.3d at 721.

/ / /

The ALJ follows a five-step sequential evaluation process in determining whether an individual is disabled.  *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert,* 482 U.S. 137, 140 (1987).  If at any step, the ALJ makes a finding of disability or non-disability, no further evaluation is required.  *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). The first step requires the ALJ to determine whether the individual is currently engaging in substantial gainful activity ("SGA").  *See* 20 C.F.R. §§ 404.1520(b) and 416.920(b).  SGA is defined as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit.  *See* 20 C.F.R. §§ 404.1572(a)-(b) and 416.972(a)-(b).  If the individual is currently engaging in SGA, then a finding of not disabled is made.  If the individual is not engaging in SGA, then the analysis proceeds to the second step.

The second step addresses whether the individual has a medically-determinable impairment that is severe or a combination of impairments that significantly limits him or her from performing basic work activities.  *See* 20 C.F.R. §§ 404.1520(c) and 416.920(c).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the individual's ability to work.  *See* 20 C.F.R. §§ 404.1521 and 416.921; Social Security Rulings ("SSRs") 85-28, 96-3p, and 96-4p.[1]  If the individual does not have a severe medically-determinable impairment or combination of impairments, then a finding of not disabled is made.  If the individual has a severe medically-determinable impairment or combination of impairments, then the analysis proceeds to the third step.

Step three requires the ALJ to determine whether the individual's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926.   If the individual's impairment or combination of

---

[1] SSRs are the SSA's official interpretations of the Act and its regulations. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1). They are entitled to some deference as long as they are consistent with the Act and regulations. *See Bray,* 554 F.3d at 1223 (finding ALJ erred in disregarding SSR 82-41).

impairments meet or equal the criteria of a listing and meet the duration requirement (20 C.F.R. §§ 404.1509 and 416.909), then a finding of disabled is made. *See* 20 C.F.R. §§ 404.1520(h) and 416.920(h). If the individual's impairment or combination of impairments does not meet or equal the criteria of a listing or meet the duration requirement, then the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the ALJ must first determine the individual's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e) and 416.920(e). RFC is a function-by-function assessment of the individual's ability to do physical and mental work-related activities on a sustained basis despite limitations from impairments. *See* SSR 96-8p. In making this finding, the ALJ must consider all the relevant evidence such as symptoms and the extent to which they can reasonably be accepted as consistent with the objective medical evidence and other evidence. *See* 20 C.F.R. §§ 404.1529 and 416.929; SSRs 96-4p and 96-7p. To the extent that statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. The ALJ must also consider opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

The fourth step requires the ALJ to determine whether the individual has the RFC to perform his past relevant work ("PRW"). *See* 20 C.F.R. §§ 404.1520(f) and 416.920(f). PRW means work performed either as the individual actually performed it or as it is generally performed in the national economy within the last fifteen years or fifteen years prior to the date that disability must be established. In addition, the work must have lasted long enough for the individual to learn the job and to perform it as SGA. *See* 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), and 416.965. If the individual has the RFC to perform his past work, then a finding of not disabled is made. If the individual is unable to perform any PRW or does not have any PRW, then the analysis proceeds to the fifth and final step.

/ / /

Step five requires the ALJ to determine whether the individual is able to do any other work considering his RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g) and 416.920(g).  If he or she can do other work, then a finding of not disabled is made.  Although the individual generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Commissioner.  The Commissioner is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the individual can do.  *Yuckert*, 482 U.S. at 141-42.

## II.     Factual Background.

### A.      Testimony at Administrative Hearing.

An administrative hearing was held before ALJ Norman Bennett on June 21, 2011, in Las Vegas, Nevada.  AR 33.  Plaintiff appeared with her attorney.  AR 35.  Vocational expert Bernard Preston also appeared.  *Id.*  Plaintiff was born on December 31, 1967, and at the time of the administrative hearing, she was forty-three years old.  AR 38.  Plaintiff reported she was 5'3½" tall and weighed 188 pounds.  *Id.*  Plaintiff was not married and had no children living with her.  *Id.*  She had a driver's license and reported being able to drive a vehicle with either an automatic or standard transmission.  AR 38-39.  Plaintiff wore glasses.  AR 39.

Plaintiff has a master's degree in education, and she was in Air Force between 1988 and 1993.  *Id.*  Plaintiff last worked in May or June 2009 as a part-time tutor, working about twenty or twenty-five hours per week.  AR 39, 42.  Plaintiff told the ALJ she stopped tutoring because of her exhaustion and cognitive dysfunction.  AR 44.  Plaintiff testified that as of the time of the hearing, she could not return to that work because she could not concentrate for the full hour session, and sometimes her exhaustion would prevent her from getting to appointments.  AR 55.

Prior to tutoring, Plaintiff worked at a teacher at Horizon Academy from 2005 through January 2007.  AR 40.  She was terminated from that position.  AR 41.  Prior to her work in education, Plaintiff worked as a security guard at U.S. Bank, a CompUSA store, and a prison construction site.  AR 42.  She also worked as a cashier in a casino.  *Id.*

/ / /

/ / /

Plaintiff testified that she felt fatigued "all day, every [] day" because of her mixed tissue disease.[1]  AR 44.  She is being treated with antibiotic therapy for her mixed tissue disease at the VA Rheumatology.  *Id.*  She follows up with her doctor every two to four months.  *Id.*  She testified that she believes her treatment was helping.  *Id.*  She chose not to take the medications that are typically prescribed for the connective tissue disease because the side effects scared her.  AR 53.

Plaintiff stated that she usually sleeps between twelve and sixteen hours per day, and sometimes more if she has "done too much." AR 44.  She reported that a month prior to hearing, she had gone on a field trip with a friend, and they were walking around Circus Circus for six hours, and for three days after the trip, she "didn't do much but sleep."  AR 45.

Plaintiff also testified that she has trouble concentrating, depending on the task.  AR 45.  She reported being able to read a book in a darkened room for a couple of hours, but in a more active situation, she could focus for no more than thirty minutes because she is easily distracted.  *Id.*  At a maximum, she can do two hours of work around her home before she has to take a nap for about two and a half hours on average.  Plaintiff testified that she suffered from a "brain fog" where she was unable to concentrate, stared off into space, could not find words to express herself, did not remember things, and could not multitask.  AR 47.

Plaintiff's mixed connective tissue disease caused her joint pain in the ankles, elbows, low back, neck, hands, wrists, and hips.  *Id.*  The pain in Plaintiff's elbows, low back, and right hand was constant.  *Id.*  Plaintiff also had muscle spasms in her low back, her legs, and her trachea/esophagus.  AR 47-48.  The muscle spasms in her throat caused trouble breathing, and Plaintiff took albuterol for that, which she testified helped control the asthma attacks.  AR 56.  Plaintiff testified that she did not have side effects from her medications.  AR 48.  Plaintiff took

---

[1] Mixed connective tissue disease is a rare autoimmune disease and features signs and symptoms of a combination of disorders, primarily lupus (an inflammatory disease that can affect many different organs), scleroderma (abnormal thickening and hardening of the skin, tissue, and organs), and polymyositis (muscle swelling).  *See* http://www.mayoclinic.org/diseases-conditions/mixed-connective-tissue-disease/basics/definition/con-20026515 (last visited May 6, 2014); http://my.clevelandclinic.org/disorders/connective-tissue-diseases/hic_mixed_connective_tissue_disease.aspx (last visited May 6, 2014).

cyclobenzaprine for muscle spasms.  *Id.*.  There were days when her pain was so bad that she could not leave her bed.  *Id.*  She took Lortab for pain.  *Id.*

Plaintiff testified that her disease also caused anxiety.  AR 49.  With medication, she had anxiety attacks every two to three months.  *Id.*  Plaintiff testified she was photosensitive, and light gave her headaches and increased the effect of her cognitive dysfunction.  AR 50.  Plaintiff testified she could sit no longer than thirty minutes at a time, and she could stand no more than about thirty minutes as well.  *Id.*  Plaintiff could walk for about a half hour, and she walked about a half mile to her mailbox every day.  *Id.*

Plaintiff testified that she wished she had more to do.  AR 51.  Plaintiff testified that she would like to return to tutoring and that she could stand up and sit down at will doing that job. AR 52.

Mr. Preston, the vocational expert ("VE") testified that a person who could lift ten pounds occasionally and five pounds frequently; with occasional postural limitations; who would have to alternate sitting and standing for thirty minute increments, sitting for up to six hours per day and standing for up to two could not perform any of Plaintiff's PRW as either a cashier, tutor, or teacher.  AR 61-62.  However, the VE testified that there are other jobs that exist in the national economy in substantial numbers that person could perform, including information clerk, credit card interviewer/phone operator, or election clerk, all of which could be performed with the sit/stand option.  AR 60-61.

The VE testified that with the added limitation that the person could only sit for a maximum of two hours total and could stand and walk for less than two hours total, there would be no jobs in the national economy that person could perform.  AR 61-62.

### B.  Plaintiff's Medical Records.

#### 1.  Adult Function Report – March 16, 2010.

Plaintiff completed an Adult Function Report on March 16, 2010.  AR 181-188.  She reported that on an average day, she worked for five hours, took one two-hour nap, and slept for about eleven hours at night.  AR 181.  She was able to care for her dogs and cats and her own personal hygiene.  AR 181-82.  Although she reported working for five hours, she also reported

that she could not do concentrated thinking for longer than three hours at a time.  AR 182.  She could prepare simple meals.  AR 183.  She took care of household tasks, but had to do them incrementally in short time periods, no more than one hour a day.  *Id.*

She left the house two or three times per day and was able to walk or drive a car.  AR 184.  She reported doing her own shopping two times per month, but she indicated her "brain fog" makes shopping difficult and overly time-consuming because of an inability to concentrate.  *Id.*  She required someone to take her to the store because it is a long trip.  AR 185.  She could take care of her finances.  AR 184.

She reported reading on an almost-daily basis with no problems, and she is able to watch a movie per week with no problems, but she can play games for no more than two hours without losing concentration.  AR 185.  She could pay attention for two or three hours at a time, and she finished what she starts.  AR 186.  She attended church on a weekly basis, but needed to nap afterward.  AR 185.  She could walk a mile, but afterward, she could not do any activity for the rest of the day or the next day.  AR 186.  She reported handling stress poorly, but she was "fine" with changes in routine.  AR 187.

## 2.  Adult Function Report—July 17, 2010.

Plaintiff completed another Adult Function Report on July 17, 2010.  AR 205-212.  Although she wrote she needed twelve to sixteen hours of sleep per night to "function at all," she reported sleeping seven hours at night and taking one three-hour nap during the day.  AR 205, 206.  She was able to take care of her pets and take them on occasional walks.  AR 206.  She could still prepare simple meals on a daily basis.  AR 207.  She could do most chores that did not involve heavy lifting in short spurts of up to thirty minutes, and then she would need to rest.  *Id.*  She did one chore per day.  *Id.*

Plaintiff left the house between one and three times daily.  AR 208.  She could still walk and drive a car.  *Id.*  Plaintiff reported attending church and bible study weekly.  AR 209.  She also reported attending pool tournaments less frequently because of low energy.  *Id.*

Plaintiff reported she could not lift more than twenty pounds, and her low back does not allow her to "bend straight."  AR 210.  She could not stand in one place for a long time because

1    it hurt her low back.  She could walk a half mile, but the next day, she would be very tired and

2    unable to concentrate.  *Id.*  She could focus for one hour at a time.  *Id.*  She reported her anxiety

3    had increased, and she often forgot things.  AR 211.

### 3.  Radiologic Reports/Tests & Lab Work.

5        In August 2001, x-rays of Plaintiff's cervical spine revealed mild mid-cervical

6    compression fractures which were "most likely old" and mild degenerative disc disease and

7    osteoarthritis.  AR 239-240.

8        On August 14, 2007, Plaintiff had an x-ray of both hips that revealed mild degenerative

9    changes.  AR 269.

10       On February 24, 2009, Plaintiff had an x-ray of her right wrist that was normal.  AR 238.

11   On April 2, 2009, Plaintiff had an x-ray of her right and left wrists, both of which were normal.

12   AR 237.  On May 29, 2009, Plaintiff had an x-ray of her right wrist taken which was normal.

13   AR 235.   An August 31, 2009, x-ray of Plaintiff's chest showed no evidence of acute

14   cardiopulmonary disease.  AR 283.  An x-ray of Plaintiff's left foot taken October 1, 2009,

15   showed a small left dorsal calcaneal spur[2] but no signs of acute fractures.  AR 282.  One of

16   Plaintiff's treating physicians, Kathryn Crooks, M.D., informed her by letter that she would need

17   no intervention for her foot except to have padding in her shoes.  AR 320.

18       On January 5, 2010, Plaintiff underwent a modified barium swallow after reporting

19   difficulty swallowing.  AR 278.  The test showed no evidence of esophageal mucosal masses,

20   stricture, obstruction, or peptic ulcer disease, but it showed she did have mild gastroesophageal

21   reflux and small Schatzki ring.[3]  AR 281.

22   ///

23   ///

24   ///

---

[2] A bony spur, also known as a heel spur, that projects from the underside of the heel bones and that may make walking painful.  http://www.medterms.com/script/main/art.asp?articlekey=7095 (last visited Apr. 28, 2014).

[3] A birth defect of the esophagus that causes narrowing of the lower esophagus and can cause problems swallowing.  *See* www.nlm.nih.gov/medlineplus/ency/article/00208.htm (last visited Apr. 24, 2014).

An x-ray of Plaintiff's lumbosacral spine on July 28, 2010, showed generalized lumbar spondylosis[4] and disc narrowing at all levels, but most prominently at L4 and L5.  AR 395, 420. Plaintiff had an x-ray of her thoracic spine the same day that showed a stable an unremarkable thoracic spine.  AR 396, 421.  X-rays of Plaintiff's cervical spine from the same date showed development of cervical spondylosis and disc degenerative changes at C3, C4, C5, and C6 and coronal stenosis[5] on the right at C3-C4.  AR 397, 417.

Plaintiff's ankle was also x-rayed on July 28, 2010.  AR 418.  The bilateral image and the image of her left ankle were unremarkable and showed no acute regional bony trauma and small bilateral dorsal calcaneal spurs.  AR 418-19.

### 4.  VA Primary Care Records.

On August 23, 2006, Plaintiff reported having daytime fatigue after only being awake for a couple of hours and after eight hours of sleep.  AR 241.  She was referred to the pulmonary clinic by the ENT Department for evaluation for sleep apnea.  *Id.*  That test was normal.  AR 309.

On July 10, 2009, Plaintiff requested and was prescribed Flexeril for muscle spasms.  AR 337.

Plaintiff saw Dr. Crooks on August 31, 2009, for fatigue and exhaustion despite adequate sleep.  AR 327.  She reported having a systemic Candida infection but denied any pain, except that her joints, hands, and feet were stiff.  *Id.*  Dr. Crooks' notes indicate Plaintiff's complete blood counts, chemical panels, and thyroid labs were all normal.  AR 328.  On September 11, 2009, Dr. Crooks sent Plaintiff a letter advising her that most of the "obscure" lab tests they ran

/ / /

/ / /

/ / /

---

[4]  A general term for age-related wear and tear affecting the spinal disks.  *See, e.g.,* http://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/basics/definition/con-20027408 (last visited Apr. 25, 2014).

[5] A narrowing of the open spaces within the spine, which can put pressure on the spinal cords and nerves that travel through the spine.  http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last visited Apr. 25, 2014).

were normal, but one of the tests for autoimmune illness was "somewhat positive,"[6] and Plaintiff needed to have an additional test done.  AR 324.

Plaintiff saw Dr. Crooks September 30, 2009, complaining of fatigue and an inability to do her work.  AR 322.  She also reported joint stiffness and tenderness.  *Id.*  Dr. Crooks referred Plaintiff for a rheumatology consultation.  AR 323.

On December 31, 2009, Dr. Kathryn Crooks sent Plaintiff a note informing Plaintiff that Plaintiff had been infected with the Epstein-Barr virus in the past and was now fully immune to it.  AR 307.

Plaintiff saw Dr. Crooks on July 19, 2010, for pains in her neck, low back, ankles, wrists and feet as well as recurrent sprains and twists in her ankles.  AR 445.  On July 29, 2010, a nurse called Plaintiff to review her x-ray results with her.  AR 443.  The nurse informed her that Dr. Crooks had referred Plaintiff for a podiatry consultation.  *Id.*

On August 17, 2010, Plaintiff saw Dr. Crooks for joint pain and pain in her neck and low back.  AR 441.  Plaintiff was referred for physical therapy.  AR 442.

Plaintiff had an eye exam on August 23, 2010, where she reported photosensitivity and dry eyes.  AR 460.

On August 24, 2010, Plaintiff had a consultation for a physical therapy treatment plan to address her pain in the lower back and neck.  AR 436.  The physical therapist noted that her range of motion in both areas was good. *Id.*  He observed "slight abdominal and upper trunk deconditioning" and instructed her to perform an in-home exercise program to address these issues as tolerated. *Id.*

On August 30, 2010, Plaintiff had a podiatry consultation because of recurrent ankle sprains and instability. AR 434.  She was fitted for orthotics on December 14, 2010.  AR 558.  A

---

[6] This is the ANA test, and it detects antinuclear antibodies in a person's blood.  A normal, healthy immune system makes antibodies to fight infection; antinuclear antibodies, however, attack the body's own tissues, specifically targeting each cell's nucleus.  In most a positive ANA test indicates that your immune system has launched a misdirected attack on your own tissue — in other words, an autoimmune reaction. But some people have positive ANA tests even when they're healthy.  *See*  http://www.mayoclinic.org/tests-procedures/ana-test/basics/definition/prc-20014566 (last visited May 6, 2014).

1  progress note from Plaintiff's May 12, 2011, appointment with the podiatrist indicated that

2  Plaintiff was doing well with foot orthotics and previously bracing.  AR 647.

3      On October 26, 2010, a Telos ankle stress study was performed bilaterally, and the results

4  were negative/unremarkable.  AR 586.

5      At Plaintiff's October 27, 2010, appointment with Dr. Crooks, Plaintiff reported that she

6  had stopped taking her antidepressant, buproprion.  AR 584.

7      Plaintiff was seen by neurologist Dr. John M. Kirk on  November 12, 2010.  AR 509.  Dr.

8  Kirk conducted an electromyelogram on Plaintiff's lower extremities.  AR 511.  He did not

9  detect any electrodiagnostic abnormality or any definite weakness.  AR 509.

10     Plaintiff was fitted for and provided with a single point cane on November 16, 2010.  AR

11  572.  The note indicates Plaintiff was "safe and steady ambulating" with the cane.  *Id.*

12     Plaintiff saw Dr. Crooks on January 11, 2011, and reported that her blood pressure had

13  been dropping low.  AR 547-48.  Dr. Crooks' notes indicate this is likely from the medication

14  Plaintiff was taking as part of the Marshall Protocol.[7]  AR 548.  She requested a blood pressure

15  cuff.  AR 552.

16     Plaintiff called into the VA's nurse line on August 2, 2011, with complaints of shooting

17  pain in her mid-back.  AR 642.  Plaintiff said she was lightheaded, but thought it was the

18  combination of Lortab and cyclobenzaprine (a muscle relaxer) she took that may have caused the

19  lightheadedness.  *Id.*  The nurse recommended Plaintiff go to the emergency room.  *Id.*  Plaintiff

20  was taken by ambulance to Desert Valley Hospital.  AR 669, 670.  After a normal CT scan and

21

22  ———————————

[7] The court's research could find only one scholarly article in the English language from BMJ
referring to the Marshall Protocol.  *See* Lassesen, K., "Patient organizations in ME and CFS seek
23  only understanding," (BMJ 22 June 2005), available at http://www.bmj.com/rapid-response/2011/10/31/patient-experiences-marshall-protocol-dangerous (last visited Apr. 28,
24  2014).  That article did not define Marshall Protocol.  It only reported the results of an internet
survey, finding it was dangerous.  *Id.*  According to the "Marshall Protocol Knowledge Base," it
25  appears this therapy was created by an electrical engineer, Trevor Marshall, and it claims to treat
chronic inflammation by taking long-term doses of antibiotics (minocycline) and/or blood
26  pressure medication (olmesartan) and reducing the body's vitamin D.  *See generally* The
Marshall    Protocol    Knowledge    Base,    available    at
27  http://mpkb.org/home/patients/protocol_overview (last visited Apr. 28, 2014).  Dr. Crooks'
progress notes refer to a similar synopsis taken from Wikipedia.  AR 465.

28

normal lab work, Plaintiff was discharged the same day with a prescription for Percoset.   AR 667.

### 5.   VA Rheumatology Records.

Plaintiff was seen on October 16, 2009, by Dr. Jaya Prasad, M.D.  AR 315.  She reported unexplained fatigue, even after sleeping fifteen hours per day.  AR 315.  She reported no joint pain but said she had constant pain in the neck muscles and low back and all over the body.  AR 316.  Her join exam was normal.  *Id.*  Dr. Prasad's assessment was that she had possible mixed connective tissue disease, and he considered referring her to a neurologist for her confusion and sleep problems.  *Id.*

Dr. Prasad's January 19, 2010, progress notes for Plaintiff state that most of her symptoms were related to mixed connective tissue disease.  AR 301.  Dr. Prasad noted Plaintiff had no major joint pain except fatigue, tiredness, and excessive sleepiness and that she was unable to function and had "fogginess in the brain."  *Id.*  Plaintiff was on Plaquenil for her mixed connective tissue disease but was "very hesitant to take the medication, since she had some simple side effects."  *Id.*

Plaintiff saw Dr. Prasad on April 19, 2010.  AR 468.  The progress notes indicate that Plaintiff was still suffering from fatigue and tiredness that rendered her disabled and unable to function.  *Id.*  Plaintiff reported the fogginess in her brain improved when she wore glasses.  *Id.*  Dr. Prasad assessed Plaintiff with chronic fatigue, recognizing her positive ANA status "with slight suggestion of mixed connective tissue disease" without the involvement of any organs.  AR 469.

Dr. Prasad's June 10, 2010, progress notes reflect that Plaintiff requested to follow the Marshall Protocol for fibromyalgia and mixed connective tissue disease.  AR 452.  Dr. Prasad directed Plaintiff to continue her usual medications.  AR 453.  Plaintiff also requested drugs to follow the Marshall Protocol from Dr. Crooks on April 23, 2010, but those drugs were only available for primary indications and FDA-approved indications.  AR 464.  At that same appointment, Plaintiff refused Dr. Crooks' offer for a referral to any weight management program despite Dr. Crooks' discussion with Plaintiff on the health risks of obesity.  AR 466.

1    Plaintiff saw Dr. Prasad on August 20, 2010.  AR 436-439.  The progress notes provide,

2    "The patient in general is doing well but continues to have generalized aches and pains over the

3    nape of the neck, over the back, as well as extreme fatigue and extreme sleepiness, for which she

4    has been on treatment."  AR 437.  Dr. Prasad also observed that Plaintiff's fatigue symptoms

5    continued despite being on her present medication.  *Id.*

6    Plaintiff saw Dr. Prasad on October 15, 2010, and she reported that she had been trying

7    Marshall Protocol and claimed she was "feeling much better than before."  AR 589.  She

8    reported her fatigue had improved in general, and she had decided to find some employment "to

9    keep [] busy."  *Id.*  The lab work she had completed on October 6, 2010, was all normal.  *Id.*  She

10   reported no side effects to her medications.  *Id.*  She reported her thinking and sleeping were

11   "much better," and she was not sleeping all day long.  *Id.*  Her joint pains, malaise, and fatigue

12   were intermittent in nature.  *Id.*  On examination, there was no evidence of active inflammation

13   over the joints. *Id.*

14   On December 4, 2010, Plaintiff saw Dr. Prasad, and the progress notes reflect that

15   Plaintiff "decided to follow Marshall Protocol," but she continued to have similar symptoms, no

16   major improvement, and persistent generalized achiness, fatigue, and "brain fog."  AR 502.  On

17   examination, she had significant trigger point tenderness all over her body.  *Id.*  Dr. Prasad's

18   final diagnosis was chronic fatigue, malaise with fibromyalgia, increased sleepiness along with

19   positive ANA status, and mixed connective tissue disease.  *Id.*

20   Plaintiff saw Dr. Prasad on March 1, 2011.  AR 493.  As a result of following the

21   Marshall Protocol, "which she started on her own," Plaintiff was hypotensive. AR 497.  Plaintiff

22   continued to struggle with fatigue, but "in general feels slightly better."  *Id.*  Dr. Prasad observed

23   that Plaintiff's chronic generalized aches were suggestive of fibromyalgia, and she had a positive

24   ANA and chronic fatigue. *Id.*

25   On September 24, 2011, Plaintiff saw Dr. Prasad, and Plaintiff's symptoms were

26   unchanged. AR 635.  Plaintiff's examination was normal, and Dr. Prasad did not observe

27   evidence of abnormalities.  AR 636.

28   / / /

Plaintiff saw Dr. Prasad on December 2, 2011.  AR 626.  She had no major joint swelling or joint pains at that time, and her examination was normal and revealed no major abnormalities. AR 626-27.

### 6.  Psychiatric Records.

Plaintiff was seen by Dr. David Orea, M.D. on February 26, 2009 and April 23, 2009, for a medication review and supportive therapy.  AR 349, 361.  She reported her energy was low, but she was able to socialize with friends.  AR 349, 361.   She indicated she experienced panic attacks two to three times per month, but she told Dr. Orea she was satisfied with her current medications.   AR 349, 361.   Plaintiff was advised, and expressed understanding, that benzodiazapines, such as the lorazepam she was prescribed, affected cognitive function.  AR 349, 361.

On November 18, 2009, Plaintiff had no complaints concerning her psychiatric condition. AR 313.  However, given her complaints of fatigue, Dr. Orea, advised her to taper off the lorazepam because benzodiazepines affect cognitive functions and alertness.  AR 313-14.

On January 9, 2010, Plaintiff saw Dr. Monjtaba Motlagh, M.D. for a mental health diagnostic assessment.  AR 299.  Dr. Motlagh noted Plaintiff looked older than her stated age. *Id.*  He found her to be cooperative, reasonable, alert, and oriented to time, place, person, place, and situation.  AR 300.  He observed that her mood and affect were anxious.  *Id.* ,

On March 5, 2010, and June 10, 2010, Plaintiff saw Dr. Motlagh for psychotherapy and medication management for her anxiety.  AR 298, 454-57, 471.

On July 12, 2010, Plaintiff saw a social worker for treatment of dysthemia.[8]  AR 446.

September 13, 2010, Plaintiff wanted increase of benzodiazepine; Dr. Motlagh said no, and increased Plaintiff's dose of Celexa (an antidepressant medication) instead.   AR 432. Plaintiff asked to switch therapists.  *Id.*

On September 17, 2010, Plaintiff was seen by a licensed clinical social worker, for anxiety.  AR 428-29.  She reported long-term use of Xanax[9] to manage her anxiety.  AR 428.

---

[8]   A   mild   but   chronic   form   of   depression.   http://www.mayoclinic.org/diseases-conditions/dysthymia/basics/definition/con-20033879 (last visited Apr. 28, 2014).

Plaintiff saw the social worker for psychotherapy on October 6, 2010.  AR 594.  Plaintiff was more relaxed during the psychotherapy session, and her affect was more congruent with the content of her dialogue.  AR 595.

Plaintiff saw Ms. Sakal for supportive psychotherapy on November 10, 2010.  AR 512.  She reported sleeping excessively.  AR 578.  She also reported being fired from her last two teaching jobs due to "boundary violations."  *Id.*

On November 18, 2010, Plaintiff reported anxiety symptoms and difficulty concentrating to the social worker.  AR 312.  She also reported she had been enjoying her activities and meeting with friends regularly to play cards and pool.  *Id.*

Plaintiff saw the social worker for psychotherapy on November 24, 2010. AR 566.

Plaintiff saw Dr. Motlagh on December 20, 2010 for therapy and medication management.  AR 500.

Plaintiff had a psychotherapy session with the social worker on February 23, 2011.  AR 545.  The social worker observed Plaintiff seemed to have difficulty focusing and prioritizing.  AR 567.  Plaintiff continued to meet with the social worker monthly for psychotherapy.  AR 653, 655.

Plaintiff saw Dr. Motlagh on April 29, 2011, for psychotherapy and medication management.  AR 648.

Plaintiff saw the clinical social worker for supportive psychotherapy on March 18, 2011.  AR 492.[10]  The notes indicate Plaintiff continued to struggle with fatigue, but her anxiety was "in check" with medication. *Id.*

On October 18, 2011, Plaintiff met with a social worker and reported a change in her sleep pattern in that she overslept.  AR 633.  She also indicated she was no longer able to clean her home.  *Id.*  The social worker observed that Plaintiff's affect was incongruent with the content of her speech, and her thought process was tangential at times.  AR 634.

---

[9] This is likely a typographical error, as Plaintiff took Ativan (lorazepam), not Xanax (alprazolam).
[10] The AR is out of order.  The page that follows is a progress note from Dr. Prasad.  Dr. Sakal's March 18, 2011, note continues at AR 495.

Plaintiff saw the social worker for treatment of mood disorder on June 15, 2011.  AR 644.  She reported that over the preceding two weeks, she had been unable to fall asleep before 5:00 am, and then she wakes up at 9:00 am.  *Id.*  Plaintiff reported taking two lorazepam daily and rated her anxiety a level three on a scale of one through ten (ten being the worst) because "the lorazepam is working."  *Id.*  The social worker assessed a mood disorder caused by Plaintiff's general medical condition.

### 7.  Dr. Motlagh's Mental RFC Questionnaire.

Dr. Motlagh completed a Mental RFC Questionnaire on Plaintiff's behalf on June 24, 2010.  He reported having seen Plaintiff on four occasions during 2010.  AR 384.  He diagnosed her with generalized anxiety disorder.  *Id.*  Plaintiff claimed to be "susceptible for other people's anxiety," but she was doing "ok" on medication.  *Id.*  He wrote that Plaintiff's prognosis was "guarded to good."  *Id.*  He also completed a check-the-box form regarding Plaintiff's symptoms, ability to do work activities on a daily basis, mental abilities and aptitudes.  AR 385-87.  He concluded Plaintiff's impairments would cause her to miss four days per month of work.  AR 388.  He was not sure whether Plaintiff's impairment would last at least twelve months or whether Plaintiff was a malingerer.  *Id.*

### 8.  Dr. Crooks' Physical RFC Questionnaire.

Dr. Crooks completed a Physical RFC Questionnaire on Plaintiff's behalf on July 19, 2010.  Dr. Crooks was Plaintiff's treating physician since August 31, 2009.  AR 390.  She diagnosed Plaintiff with mixed connective tissue disorder, myalgias, fatigue, anxiety, and panic, and she opined these were lifelong conditions.  *Id.*  She observed Plaintiff suffered from chronic pain in her neck, low back, ankles, feet, hands, and elbows, she had muscle aches, skin irritation, and headaches.  *Id.*  Medications were not effective enough in controlling Plaintiff's pain, and higher dosages increased drowsiness. *Id.*  She found Plaintiff's impairments had lasted or would last twelve months or longer, and that Plaintiff was not a malingerer.  *Id.*

She opined Plaintiff's impairments would frequently interfere with her attention and concentration at work, and that she was incapable of even "low stress" jobs.  AR 391.  She observed Plaintiff would walk no more than two city blocks without severe pain or rest.  *Id.*  She

found Plaintiff could sit for twenty minutes at a time and stand for fifteen minutes at a time, and she could sit, stand, or walk for no more than two hours total per day.  *Id.*  Plaintiff would need to include ten-minute periods of walking in an eight-hour workday every twenty minutes, and she would need a job that would permit shifting at will from sitting to standing or walking.  AR 392.  Plaintiff could occasionally lift ten pounds or less, should rarely lift twenty pounds, and should never lift fifty pounds.  *Id.*

Dr. Crooks also believed Plaintiff should only: occasionally move her head and neck, never twist, rarely stoop, occasionally crouch or squat, never climb ladders, and occasionally climb stairs.  AR 393.  Plaintiff had significant limitations with reaching handling and fingering such that she should only use her hands to grasp, turn, and twist objects ten percent of an eight-hour day; use her fingers for fine manipulations twenty five percent of an eight hour day; and use her arms to reach one percent of an eight-hour day.  *Id.*  Dr. Crooks opined that Plaintiff's impairments would likely cause her to miss more than four days of work per month.  *Id.*  She also noted that Plaintiff has light sensitivity that requires her to wear dark glasses indoors.  *Id.*  Dr. Crooks wrote that all of these symptoms and limitations had been present since Plaintiff's first appointment with her on August 31, 2009.  AR 394.

### 9.  Dr. Prasad's Physical RFC Questionnaire.

Dr. Jaya Prasad completed a Physical RFC Questionnaire about Plaintiff on August 18, 2010.  Dr. Prasad was Plaintiff's treating rheumatologist and had seen Plaintiff every four weeks since October 2009.  AR 398.  Dr. Prasad diagnosed Plaintiff with mixed connective tissue disease and fatigue and found her prognosis was poor. *Id.*  Plaintiff suffered from fatigue, headaches, musculoskeletal pains, trigger point tenderness, and joint pain.  AR 398.  Plaintiff took antidepressants, anti-inflammatories, and muscle relaxers with no improvement.  *Id.*  Plaintiff's condition had lasted or would last twelve months, and she was not a malingerer. *Id.*  She was under the care of a psychiatrist for depression, anxiety, and psychological factors affecting her physical condition.  *Id.*

Dr. Prasad opined Plaintiff's impairments would constantly interfere with her attention and concentration during an eight-hour workday.  AR 399.  Plaintiff would be incapable of even

low stress jobs because she "stays in bed because of fatigue." *Id.* Plaintiff could not walk any city blocks without rest or severe pain, she could sit fifteen minutes at one time before needing to stand, and could stand twenty minutes before needing to sit or walk. *Id.* Plaintiff could only sit, stand, or walk for less than two hours total during an eight-hour workday. *Id.*

Plaintiff would need to include ten minute long periods of walking during an eight-hour workday every thirty minutes. AR 400. She would need a job that permitted shifting positions at will from sitting to standing or walking, and she would need unscheduled fifteen to thirty minute breaks four to five times per shift. *Id.* Plaintiff should rarely lift less than ten pounds and should never lift anything heavier than ten pounds. *Id.* She should only rarely move her head and neck and rarely twist, stoop/bend, crouch/squat, climb ladders, or climb stairs. AR 401. She was significantly limited with reaching, handling, and fingering such that she could only use her hands to grasp, turn, or twist objects for ten percent of an eight-hour workday; use her fingers for fine manipulations for ten percent of an eight hour workday; and never use her arms for reaching. *Id.* She would miss more than four days of work per month because of her impairments. *Id.* Plaintiff slept most of the day because of her fatigue and depression. *Id.* She has experienced these symptoms and limitations longer than one year. AR 402.

Dr. Prasad also completed a second physical RFC questionnaire on December 1, 2011, well after the ALJ's July 1, 2011, decision in this case. AR 605-609. However, the court is required to consider evidence submitted to the Appeals Council, so long as it relates to the period on or before the ALJ's decision. *See Brewes v. Commissioner of Soc. Sec. Admin.,* 682 F.3d 1157, 1162 (9th Cir. 2012). Dr. Prasad's RFC assessment relates back to 2008. To the extent the responses are different from the first assessment, the court will discuss them. Dr. Prasad upgraded Plaintiff's prognosis from poor to stable. AR 605. Her symptoms and clinical findings remained essentially the same, but Plaintiff had the added symptom of being unable to focus or concentrate. AR 605. Plaintiff was not a malingerer. AR 606.

Plaintiff could not walk even one city block. AR 607. Plaintiff could stand fifteen minutes at a time. *Id.* Plaintiff would need three or four unscheduled breaks that are thirty or forty minutes in duration. AR 608. Plaintiff could frequently lift ten pounds or less and never

left twenty or fifty pounds.  *Id.*  She was significantly limited with reaching, handling, and fingering such that she could only use her hands to grasp, turn, or twist objects for twenty percent of an eight-hour workday; use her fingers for fine manipulations for twenty percent of an eight hour workday; and use her arms for reaching twenty percent of an eight hour workday.  *Id.*  Plaintiff could bend or twist at the waist twenty percent of an eight hour workday.  *Id.*  He observed Plaintiff was very depressed and moody.  AR 609.

### 10. Psychiatric Review Technique.

Dr. Pastora Roldan, Ph.D., completed a Psychiatric Review Technique of Plaintiff on September 14, 2010, and found that Plaintiff suffered from generalized anxiety disorder and chronic post-traumatic stress disorder, but these conditions were non-severe.  AR 403, 408.  She specifically considered Listing 12.06.  AR 413.  With respect to the Paragraph B criteria, Dr. Roldan found Plaintiff was mildly restricted in her activities of daily living; had mild difficulties maintaining social functioning; had mild difficulties maintaining concentration, persistence, and pace; and had no episodes of decompensation of extended duration.  *Id.*  Dr. Roldan found no evidence to establish the presence of Paragraph C criteria.  AR 414.

### 11. Medical Source Statement.

Dr. Vincent Scoccia examined Plaintiff on October 20, 2010, for the Bureau of Disability Adjudication.  AR 473.  The only abnormality observed in his examination was that Plaintiff had a "somewhat flat affect."  AT 475.  He diagnosed her with connective tissue disorder and anxiety.  *Id.*  Dr. Scoccia also completed a Consultative Examination Medical Source Statement.  AR 477-479.  In a check-the-box form, Dr. Scoccia found Plaintiff could occasionally lift and/or carry ten pounds.  AR 477.  She could stand and/or walk less than two hours cumulatively in an eight-hour day and needed an assistive device to ambulate and get up and down.  *Id.*  Plaintiff could sit for two hours cumulatively in an eight hour day, and she would need to alternate standing and sitting such that standard breaks and lunch periods would not provide sufficient relief.  *Id.*  He found Plaintiff could occasionally climb ramps or stairs but could never climb ladders or scaffolds or balance, stoop/bend, kneel, crouch/squat, or crawl.  *Id.*  He found Plaintiff was limited in reaching, fingering, handling objects, speaking, and traveling.  AR 478.  He also

21

found Plaintiff's general appearance and behavior were normal, and her functional overlay was good. *Id.*

### 12. Physical RFC Assessment.

Dr. Elsie Villaflora, M.D., a medical consultant, completed a physical RFC for Plaintiff on November 4, 2010. AR 481-488. Dr. Villaflora found Plaintiff could: occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday; sit about six hours total during an eight hour workday, push and pull without limitation. AR 482. She found Plaintiff could never climb ladders or scaffolds, but could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. AR 483. She found Plaintiff had no manipulative, visual, or communicative limitations. AR 484-85. Plaintiff should avoid concentrated exposure to extreme heat or cold; fumes, odors, dusts, gases, poor ventilation; and hazardous machinery. AR485. She commented that Plaintiff's allegations of her symptoms and their severity were disproportionate to the objective findings. AR 486. She found the Medical Source Statements[11] she reviewed were too restrictive considering the objective findings. AR 487.

### III      The ALJ's Decision.

The ALJ followed the five-step sequential evaluation process set forth at 20 C.F.R. §§ 404.1520 and 416.920 and issued an unfavorable decision on July 1, 2011. AR 19-27. At step one, the ALJ found Plaintiff had not engaged in SGA since June 1, 2009, the alleged onset date. At step two, the ALJ found Plaintiff had the following severe impairments: fibromyalgia, connective tissue disease, chronic fatigue, and obesity. *Id.* In making his findings at step two, the ALJ specifically considered all of Plaintiff's medically determinable impairments, including her non-severe impairment of anxiety. *Id.* He concluded that her non-severe impairment did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and was, therefore, non-severe. *Id.*

/ / /

---

[11] The Assessment does not state which Medical Source Statements Dr. Villaflora reviewed.

The ALJ also considered the Paragraph B criteria in Listing 12.00C of the Listing of Impairments set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1. AR 24. Specifically, the ALJ determined that in the first three functional areas of activities of daily living; social functioning; and concentration, persistence, and pace, Plaintiff had mild limitations. *Id.* With regard to the fourth functional area, the ALJ found Plaintiff had experienced no episodes of decompensation of extended duration. *Id.* Although Plaintiff stated she had anxiety and difficulty concentrating, the greater weight of the evidence showed Plaintiff had relatively normal mental status examinations. She was coherent, relevant, logical, and had good insight and judgment; she demonstrated no evidence of mania, anxiety, or cognitive defects. *Id.* In late 2009, she reported enjoying social activities with her friends. *Id.* She did not report any exacerbation of her condition. *Id.*

Dr. Motlagh, Plaintiff's treating psychiatrist reported on June 24, 2010, that Plaintiff was doing "ok" on medication, and her prognosis was guarded to good. *Id.* He found her ability to perform at a consistent pace was limited, but not precluded, and she could meet the competitive standards of a regular work environment. *Id.* Dr. Motlagh was not sure whether Plaintiff was a malingerer or whether her impairments would last longer than twelve months. AR 21-22. Plaintiff told him her medications were helping. AR 22. Because Plaintiff's medically-determinable mental impairment caused no more than mild limitation in the first three functional areas and no episodes of decompensation of extended duration, the ALJ found it was non-severe. AR 21, 22

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, including Listing 12.00C. *Id.*

After consideration of the entire record, the ALJ concluded that Plaintiff had the RFC to perform less than sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a). Specifically, he found she could lift ten pounds occasionally and five pounds frequently. *Id.* In an eight-hour workday, Plaintiff could sit a total of six hours, stand and/or walk for two hours,

/ / /

alternating sitting and standing every thirty minutes.  *Id.*  The ALJ found Plaintiff was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling.  *Id.*

In making this finding, the ALJ considered Plaintiff's statements at the hearing and in her function report concerning her symptoms—specifically, that she had chronic fatigue, pain, and a cognitive dysfunction.  *Id.*  He considered her testimony that she could perform household work for two hours before she was tired and needed a nap.  AR 23.  She wrote in her function report she attended to personal care and hygiene, took care of her cats and dogs, prepared simple daily meals, went grocery shopping, and was able to drive and go out independently.  *Id.*  Although she testified she was easily distracted, she also testified she could read for two hours at a time.  *Id.*  In her function report, she reported she could finish what she started, could follow written and verbal directions, socialized with friends, and went to church.  *Id.*  Although she claimed an inability to handle stress, she reported that she could manage a change in routine.  *Id.*  The ALJ found it particularly notable that Plaintiff testified there were days Plaintiff was bored at home.  *Id.*

He determined Plaintiff's statements about the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with his RFC assessment.  *Id.*  He found the medical evidence did not support Plaintiff's allegations about her ability to lift, sit, stand and/or walk for extended periods.  *Id.*  Plaintiff's treatment history was conservative and only consisted of follow-ups, medications, and lab work.  *Id*.

In 2009, all of her x-rays were normal, including those for her wrists, foot, chest, with the exception of a small bone spur on the x-ray of her left foot.  *Id.*  Although she complained of fatigue and slept more than twelve hours per day, she denied any pain and was treated only with medication.  *Id.*  Her lab work was normal, with the exception of the "slight positive" result for autoimmune illness.  *Id.*  Her physical exams were normal.  A stress test was normal.

In 2010, Plaintiff was seen for complaints of brain fog, fatigue, malaise, and excessive sleepiness related to her mixed connective tissue disease.  AR 23-24.  Her physical examinations were unremarkable, she had no major joint pains, and she stated she was not taking her prescribed medication because she did not want the side effects.  AR 24.  There was no evidence

of any systemic involvement with Plaintiff's positive ANA result.  *Id.*  Her liver and kidney functions were normal, and her brain fog improved when she wore glasses.  *Id.*  In July 2010, Plaintiff was seen for neck and back pain; her physical exam was unremarkable except for a somewhat decreased range of motion in her neck.  *Id.*  X-rays of Plaintiff's spine showed spondylosis and disc narrowing at L4-L5, but her thoracic spine x-ray was unremarkable.  *Id.*  In August 2010, her physical therapy notes showed her pain was intermittent, and her pain was minimal during the exam.  *Id.*  Her treatment plan was conservative, consisting of home exercises, instruction on body mechanics, and a tens unit.  *Id.*

A physical examination in October 2010 was unremarkable except for a somewhat decreased range of motion in Plaintiff's extremities.  *Id.*  Plaintiff reported feeling "much better than before," with less fatigue, her sleep had improved such that she was no longer sleeping in the day, and her thinking was better.  *Id.*  She indicated she wanted to find employment to keep herself busy.  *Id.*  Her joint pain, malaise, and fatigue continued to be intermittent.  *Id.*  In November 2010, Plaintiff reported that she planned to resume tutoring, and she had a car and could drive.  *Id*.  She underwent an EMG that was unremarkable, and she admitted to oversleeping and not exercising.  *Id*.  Although Plaintiff reported sleeping eighteen hours straight in 2011, the ALJ found she was not taking specific medications and was following a protocol on her own. AR 25.  Records from March 2011 showed she was feeling better despite continued complaints of fatigue.  *Id.*

With regard to opinion evidence the ALJ gave significant weight to the opinion of DDS, which found Plaintiff had no severe mental impairments.  *Id.*  The ALJ also found the DDS' RFC finding was consistent with the objective medical evidence and consistent with the record as a whole.  *Id.*  The ALJ gave less weight to the opinions of Drs. Crooks[12] and Prasad, finding their opinions were inconsistent with objective medical evidence and the record in its entirety.  *Id.*  The ALJ also gave less weight to Dr. Scoccia's opinion, finding it was vague, inconsistent with the record as a whole and objective medical evidence.  *Id.*  The ALJ also found Dr.

---

[12] The ALJ incorrectly refers to Dr. Crooks as "Dr. Crooksman."

Scoccia's opinion inconsistent with his own findings, which were that Plaintiff appeared normal and demonstrated normal behavior.  *Id.*

The ALJ gave no weight to Dr. Motlagh's opinion because it was inconsistent with the record as a while and the greater weight of the objective medical evidence.  Additionally, the ALJ found Dr. Motlagh's opinion was inconsistent with Dr. Motlagh's own observation that he was unsure whether Plaintiff was a malingerer or whether her impairments would last more than twelve months.  AR 25-26.  The ALJ also gave no weight to statements by Robert Hutchinson to the extent he concluded Plaintiff's condition was disabling and debilitating.  AR 26.  His opinion was also inconsistent with the record as a whole and the objective medical evidence.  *Id.*  Finally, the ALJ noted that his RFC assessment gave Plaintiff "the maximum benefit of the doubt."  *Id.*

At step five, the ALJ found Plaintiff was not capable of performing her PRW, all of which was either light/skilled or light/unskilled with an RFC to perform sedentary work with restrictions.  The ALJ found that Plaintiff was a younger individual on the alleged onset disability date, had a high school education, and could communicate in English.  The ALJ did not consider transferability of job skills because using the Medical-Vocational Rules supports a finding that Plaintiff was "not disabled," whether or not she had transferable job skills.  *Id.*  If Plaintiff could perform a full range of sedentary work, pursuant to Medical-Vocational Rule 201.28, she would be "not disabled."  *Id.*  However, considering Plaintiff's additional limitations, she would not be able to perform all or substantially all of the requirements of sedentary work.  *Id.*

In order to determine the extent to which Plaintiff's additional limitations eroded the unskilled sedentary occupational database, the ALJ asked the vocational expert ("VE") whether jobs exist in the national economy for a person with Plaintiff's age, education, work experience, and RFC.  *Id.*  The VE responded that person would be able to perform the requirements of representative occupations such as information clerk (sedentary, unskilled work with 746 positions in Nevada and 84,770 positions nationwide), credit card interviewer (sedentary, unskilled work with 338 positions in Nevada and 33,037 positions nationally), and election clerk (sedentary, unskilled work with 727 positions in Nevada and 97,811 positions nationally).  *Id.*

Although the VE's testimony was inconsistent with information contained in the *Dictionary of Occupational Titles* (the "DOT"), the VE explained that the DOT did not classify sit/stand options for jobs.  *Id.*  The ALJ accepted the VE's testimony in accordance with SSR 00-4p[13] because it was based on his experience and observation of sit/stand jobs as they existed in the national economy.  *Id.*

Based on the VE's testimony, the ALJ concluded that considering Plaintiffs age, work experience, education, and RFC, she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.  Therefore, a finding of not disabled was appropriate under the framework of Medical-Vocational Rule 201.28

## IV.   The Parties' Positions.

### A.   Plaintiff's Motion to Remand and/or Reverse.

Plaintiff argues that the ALJ erred in determining her RFC, and asserts that his finding lacks the support of substantial evidence in the record.  First, Plaintiff contends the ALJ erred in finding she did not suffer from a severe mental impairment.  She asserts that the treatment records in the AR demonstrate that she suffers from depression, anxiety, panic attacks, and frustration secondary to her chronic physical problems, and the additional records submitted to the Appeals Council reflect her ongoing mental impairment.  Second, Plaintiff contends the ALJ failed to properly examine the medical records in determining her physical RFC and improperly rejected certain physicians' opinions without providing specific and legitimate reasons.  Plaintiff's treating physicians, Dr. Crooks and Dr. Prasad, determined Plaintiff was significantly limited, and the ALJ rejected these opinions in favor of the non-examining, non-treating state agency reviewing physician.  The ALJ also rejected consultative examiner Dr. Scoccia's opinion.  Plaintiff asserts the ALJ's rejection of these opinions as inconsistent with the medical evidence, examination results, and the AR in its entirety is unspecific and not legally sufficient.

/ / /

---

[13]  SSR 00-4p requires that before relying on a VE's testimony to support a disability determination or decision, an ALJ must obtain a reasonable explanation for any conflicts between occupational evidence presented by the VE and information in the DOT and explain how any conflict was resolved.

Additionally, Plaintiff contends the ALJ's credibility determination lacks the support of substantial evidence in the record.  Specifically, Plaintiff asserts the ALJ impermissibly rejected her subjective symptom testimony because he did not articulate any clear or convincing reasons to reject it, and there was no evidence of malingering.  The ALJ rejected Plaintiff's subjective symptom testimony because here complaints were inconsistent with her daily activities.  Plaintiff asserts this is not a clear and convincing reason.  Additionally, the ALJ's credibility determination "is also indicative of an extreme lack of medical understanding of the debilitating effect of fibromyalgia."  Motion at 10:21-22.  Plaintiff asserts her testimony should be credited as true, and this matter should be remanded for an award of benefits.

**B.**     **The Commissioner's Cross-Motion for Summary Judgment & Opposition.**

The Commissioner asserts that although the ALJ did not find Plaintiff suffered from a severe mental impairment, he had to consider the functional effect of all her impairments—severe and non-severe—together to determine her RFC.  Therefore, the fact that the ALJ did not identify Plaintiff's anxiety disorder as severe is irrelevant because he was required to consider it along with her severe impairments of fibromyalgia, connective tissue disease, chronic fatigue, and obesity, in determining Plaintiff's RFC.  Additionally, the ALJ specifically considered Plaintiff's mental impairment, its symptoms, and Dr. Motlagh's opinion.  The evidence Plaintiff submitted to the Appeals Council did not contain a new medical source statement regarding Plaintiff's functional limitations, and as the Appeals Council noted, did not warrant a change in the ALJ's opinion.  Therefore, the ALJ did not err, and remand is not required.

Second, the Commissioner contends the ALJ's RFC finding that Plaintiff could perform a reduced range of was supported by substantial evidence in the record.  Plaintiff's physical exams were routinely normal and showed no neurological deficits or evidence of inflammatory process.  Her x-rays showed no or minimal abnormalities.  All of her lab work was normal except for a "slightly positive" ANA test, and Dr. Prasad noted that there was no evidence of systemic involvement, and her kidney, liver, and other major organs functioned normally.

Third, the Commissioner asserts the ALJ properly rejected the opinions of Plaintiff's treating physicians Dr. Crooks and Dr. Prasad as inconsistent with the objective medical

evidence, examination results, and the record in its entirety. The ALJ found that Plaintiff's examination findings were normal, and her x-ray and laboratory results were negative or minimal. The only notable abnormality was the positive ANA result, but even Dr. Prasad indicated there was no systemic involvement. In light of these findings, the Commissioner contends the ALJ properly rejected Dr. Crooks' and Dr. Prasad's opinions. Additionally, the Commissioner asserts the ALJ properly gave little weight to Dr. Scoccia's opinion, finding the limitations he assessed were not supported by his negative examination findings.

Finally, the Commissioner asserts that substantial evidence supports the ALJ's determination that Plaintiff was not credible. The ALJ determined that the medical evidence did not support Plaintiff's allegations of disability. In addition, he found that Plaintiff's complaints were not fully credible for a number of specific reasons. For example, Plaintiff reported that her "brain fog" improved when she wore glasses, and her October 2010 progress notes reflect that she was "feeling much better than before," and her sleeping had improved. Plaintiff also did not follow her prescribed treatment, but when she did, she indicated her thinking was much better, and her sleep pattern had improved. She also testified that she was looking for work to keep busy because she became bored at home. The ALJ also considered Plaintiff's activities of daily living and found they were inconsistent with her reported symptoms.

**V.     Analysis and Findings**

Plaintiff argues that the ALJ erred by (a) finding Plaintiff's alleged mental impairment was non-severe; (b) incorrectly assessing her RFC; (c) improperly rejecting the opinions of Plaintiff's treating physicians; and (d) improperly determining Plaintiff was not credible to the extent her reported symptoms were inconsistent with Plaintiff's RFC finding. For the reasons set forth below, after reviewing the record as a whole and weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion, the court finds the ALJ's decision is supported by substantial evidence, and the ALJ did not commit reversible error.

**A. Plaintiff's Alleged Mental Impairment.**

Plaintiff argues the ALJ erred by determining Plaintiff's mental impairment was non-severe at step two. She asserts that the evidence of record shows Plaintiff suffers depression,

anxiety, panic attacks, and frustration secondary to her chronic physical problems, and records submitted to the Appeals Council reflect her on-going impairment.   At step two, the ALJ determined Plaintiff had severe impairments of fibromyalgia, connective tissue disease, chronic fatigue, and obesity.  AR 21.  He determined Plaintiff's anxiety did not cause more than a mild limitation in her ability to perform basic mental work activities and was therefore non-severe. *Id.*  In making that determination, the ALJ specifically considered the paragraph B criteria.  AR 21-22.

Having reviewed the record as a whole, the court finds substantial evidence supports the ALJ's determination that Plaintiff's anxiety was non-severe for the following reasons.  First, nearly all of Plaintiff's psychiatric visits report that she was cooperative, reasonable, alert, and oriented.  *See, e.g.,* AR 300, 314, 350, 429, 447, 512, 545, 567, 595, 634, 645.  In February and April 2009, she reported to Dr. Orea that although she had two to three panic attacks per month, she was satisfied with her medication.  AR 349, 361.  She reported in April 2009 and November 2009 that she was able to enjoy her activities and socialized with her friends regularly to play cards and pool.  AR 349, 312.  She had no complaints about her psychiatric condition when she saw Dr. Orea in November 2009.  AR 313.  As of March 2011, Plaintiff's progress notes reflect that her anxiety was "in check" with medication.  AR 492.  In June 2011, Plaintiff reported that her anxiety was a three on a scale of one to ten, with ten being the worst, because her medication was working.  AR 644.

Additionally, the Psychiatric Review Technique completed by Dr. Roldan on September 14, 2010, also supports the ALJ's conclusions.  Dr. Roldan found Plaintiff was mildly restricted in her activities of daily living; had mild difficulties maintaining social functioning and maintaining concentration, persistence, and pace; and had no episodes of decompensation of extended duration.  AR 413.  Dr. Roldan concluded Plaintiff's mental impairments were non-severe.  AR 403, 408.  Plaintiff's treating psychiatrist's Mental RFC Questionnaire also indicates Plaintiff was doing "ok" on medication, her prognosis was "guarded to good."   AR 384.  Additionally, Dr. Motlagh completed a check-the-box form regarding Plaintiff's mental abilities and aptitudes for unskilled work, and in every area he rated except one, he found Plaintiff's

ability was "limited, but satisfactory."  AR 386-87.  He also wrote that he was unsure whether Plaintiff was a malingerer.  AR 388.

Reviewing the record as a whole, substantial evidence supports the ALJ's conclusion that Plaintiff's mental impairment caused no more than mild limitations in the first three functional areas and no episodes of decompensation of extended duration in the fourth functional area, and was therefore, non-severe.

**B.  Plaintiff's RFC/Rejection of Drs. Crooks' and Prasad's Opinions.**

Plaintiff contends the ALJ erred in assessing her physical RFC by improperly rejecting Dr. Crooks' and Prasad's opinions.  The ALJ found Plaintiff had the RFC to perform a reduced range of sedentary work.  Specifically, he found Plaintiff could lift and carry ten pounds occasionally and five pounds frequently.  During an eight-hour day, he found Plaintiff could sit a total of six hours and stand or walk for two hours, alternating sitting and standing every thirty minutes.  He limited Plaintiff to occasional climbing, balancing, stooping, kneeling, crouching, or crawling.  In making this finding the ALJ conducted a thorough review of Plaintiff's examinations, x-rays, lab work, and medical opinion evidence.  All of Plaintiff's x-rays were normal or showed only minimal abnormality.  *See, e.g.,* AR 235, 237, 238, 239-40, 269, 283, 395, 396, 397, 418-19.  All of Plaintiff's lab work was normal except for the "slightly positive" ANA test, and Plaintiff's own treating rheumatologist indicated that there was "no evidence of any systemic involvement, with normal kidney functions, normal liver functions, with no involvement of the major organs."  AR 324, 328, 468, 667.

The ALJ found, and the record supports, that Plaintiff's physical examinations were routinely normal, and her treatment plan was conservative.  *See, e.g.,* AR 301, 315-16, 436-37, 444, 468, 469, 475, 626-27, 636.  In addition, Plaintiff chose to follow the Marshall Protocol, without supervision by or direction from her doctors.  AR 497, 502.  In fact, at Plaintiff's June 10, 2010, appointment, she asked Dr. Prasad about the Marshall Protocol, and he directed Plaintiff to continue her medications as prescribed.  Despite that, by December 10, 2010, she had started following the Marshall Protocol on her own.  AR 453, 497, 502.  She also refused Dr.

1    Crooks' referral to a weight management program.  AR 466.  She declined to take medication

2    recommended by Dr. Prasad because she had some "simple side effects."  AR 301.

3          The ALJ also considered the medical opinion evidence, and Plaintiff contends the ALJ

4    improperly rejected the opinions of Drs. Crooks and Prasad, Plaintiff's treating physicians.  She

5    argues that the ALJ's rationale that these opinions were inconsistent with the objective medical

6    evidence, examination results, and the record as a whole is legally insufficient, and the ALJ was

7    required to set forth specific legitimate reasons, supported by substantial evidence from the

8    record, to reject these opinions.

9          The implementing regulations for Title II of the Social Security Act distinguish among

10   the opinions of three types of physicians: first, treating physicians; second, examining physicians

11   (i.e., physicians who examine but do not treat a claimant); and third, non-examining or reviewing

12   physicians (i.e., physicians who neither examine nor treat the claimant, but review the claimant's

13   file). *Lester v. Chater,* 81 F.3d, 821, 830 (9th Circuit 1995); 20 C.F.R. § 404.1527(d). Generally,

14   a treating physician's opinion is entitled to more weight than an examining physician's, and an

15   examining physician's opinion is entitled to more weight than a reviewing physician's. *Lester,* 81

16   F.3d at 830; 20 C.F.R. § 404.1527(d). The Social Security Regulations give more weight to

17   opinions that are explained than those that are not. 20 C.F.R. § 404 .1527(d)(3). The Social

18   Security Regulations also give more weight to opinions of specialists concerning matters relating

19   to their specialty over that of non-specialists. 20 C.F.R. § 404.1527(d)(5).

20         The ALJ must consider all medical evidence. *See* 20 C.F.R. § 404.1527(b). When an ALJ

21   rejects a treating physician's opinion that is contradicted by another doctor, the ALJ must provide

22   specific, legitimate reasons based on substantial evidence in the record. *See Valentine v. Comm'r*

23   *of Soc. Sec. Admin.,* 574 F.3d 685, 692 (9th Cir.2009); *Ryan v. Comm'r of Soc. Sec. Admin.,* 528

24   F.3d 1194, 1198 (9th Cir.2008). An ALJ satisfies the burden of providing specific, legitimate

25   reasons to reject a controverted treating physician opinion where he or she sets out a "detailed

26   and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

27   thereof, and making findings." *Magallanes v. Bowen,* 881 F.2d 747, 757 (9th Cir.1989). An ALJ

28   need not accept the opinion of any physician, including a treating physician, if that opinion is

brief, conclusory, and inadequately supported by clinical findings. *See Chaudhry v. Astrue,* 688 F.3d 661, 671 (9th Cir. 2012); *Bray v. Comm'r of Soc. Sec. Admin.,* 554 F .3d 1219, 1228 (9th Cir.2009).  An ALJ is not required to give controlling weight to a treating physician's opinion unless it is well-supported and not inconsistent with other substantial evidence in the record.  *See Chaudhry,* 688 F.3d at 671; 20 C.F.R. §§ 404.927(d)(2), 416.927(d)(2).

Here, the ALJ set forth specific and legitimate reasons, supported by substantial evidence in the record, for rejecting the opinions of Dr. Crooks and Dr. Prasad.  The ALJ spent three pages discussing the substantial evidence that supported his findings prior to rejecting Drs. Crooks' and Prasad's opinions.  An ALJ is required to discuss and evaluate the evidence that supports his or her conclusion; but there is no requirement that he or she do so in any particular order or under any particular heading.  *See, e.g., Lewis v. Apfel*, 236 F.3d 503, 513 (9th Cir. 2001) (citing *Marcia v. Sullivan,* 900 F.2d 172 (9th Cir. 1990)).  Here, the ALJ summarized the evidence in the AR, finding, essentially, that Plaintiff's physical examinations were normal, and her x-ray and laboratory findings were negative or minimal.

Likewise, the ALJ set forth specific, legitimate reasons, supported by substantial evidence, for rejecting Dr. Scoccia's opinion.  The ALJ found Dr. Scoccia's opinion was vague and inconsistent with the objective medical records as a whole and also with his own findings that Plaintiff appeared normal and demonstrated normal behavior.  The court's own review of the AR reveals Dr. Scoccia's physical examination of Plaintiff was normal and notes no abnormalities whatsoever. AR 474-75, 478.  Dr. Scoccia's findings simply do not support the limitations noted in the check-the-box Medical Source Statement he completed.  There is no support, for example, for the limitations that Plaintiff should never balance, stoop/bend, kneel, crouch/squat, or crawl, or for the limitation that she only sit for two hours of an eight-hour workday.  The court agrees that Dr. Scoccia's opinion was inconsistent with his own findings and the record as a whole.

Additionally, the ALJ afforded significant weight to the DDS Medical Source Statement. Although the contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a treating physician's opinion, it may constitute

1   substantial evidence when it is consistent with other independent evidence in the record.  *See*

2   *Mangallanes v. Bowen,* 881 F.2d 747, 752 (9th Cir. 1989).  Here, the ALJ found the DDS

3   opinion was consistent with the objective medical evidence and the record as a whole.  In sum,

4   the court finds that the ALJ thoroughly considered the record before him, and the court has

5   considered the AR—including the medical records submitted to the Appeals Council—and finds

6   that substantial evidence supported the ALJ's RFC finding.

7       **C.  Plaintiff's Credibility.**

8       Plaintiff asserts the ALJ erred by failing to articulate clear and convincing reasons for

9   rejecting Plaintiff's pain and limitation testimony.  In assessing the credibility of a claimant's

10   testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step

11   analysis.  *Molina v. Astrue,* 674 F.3d 1104, 1112 (9th Cir. 2012) (citing *Vasquez v. Astrue,* 572

12   F.3d 586, 591 (9th Cir. 2009)).  First, the ALJ must determine whether there is objective medical

13   evidence of an impairment which could reasonably produce the pain or other symptoms alleged.

14   *Id.*  Second, if such evidence exists, the ALJ must give specific, clear and convincing reasons for

15   rejecting the claimant's testimony about the severity of her symptoms.  *Id.*  In evaluating the

16   claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation, including

17   considering inconsistencies in the testimony or between the testimony and the claimant's conduct

18   or unexplained failure to seek treatment or follow a prescribed course of treatment.  *See*

19   *Tommasetti,* 533 F.3d at 1039 (citing *Smolen,* 80 F.3d at 1284).  Additionally, the ALJ may also

20   consider whether the claimant engages in daily activities inconsistent with the alleged symptoms.

21   *See Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007).

22       The court finds the ALJ in this case properly followed the two-step analysis described

23   above.  First, he found that the medical evidence did not support Plaintiff's allegations of

24   disability.  AR 23.  For example, he observed that Plaintiff's treatment history was conservative

25   and consisted of follow-ups, medications, and lab work.  Although Plaintiff complained of neck

26   and back pain, on physical examinations were unremarkable and showed no evidence of

27   inflammatory process or acute inflammation in the joints.  *See, e.g.,* AR 301, 327, 437.  Her

28   progress notes indicated that as of October 2010, Plaintiff was "feeling much better than before."

Again in March 2011, Plaintiff reported feeling slightly better, though she still complained of fatigue.  AR 493.  Additionally, all of her x-rays were negative or showed only minimal abnormalities.  The ALJ also found that Plaintiff's subjective complaints were not credible because they were inconsistent with other statements she made.  For instance, Plaintiff reported that her brain fog improved when she wore glasses.  Furthermore, Plaintiff did not take her medication as prescribed, and she followed her own treatment plan.  AR 493.  She also reported to her doctor and testified at the hearing that she planned to resume tutoring and that she was going to look for work to keep busy because she was bored at home when she had energy.  AR 51, 517.

Contrary to Plaintiff's assertions, the ALJ did not solely rely on Plaintiff's daily activities in discrediting her testimony.  Although that was one factor he considered, as set forth above, the ALJ made additional specific findings to support his credibility determination.  The ALJ was permitted to consider daily living activities in his credibility analysis.  *See Burch v. Barnhart,* 400 F.2d 676, 680 (9th Cir. 2005).  The Ninth Circuit has explained that if a plaintiff engages in numerous daily activities that could be transferred to the workplace the ALJ may discredit the claimant's allegations upon making specific findings related to those activities.  *Id.* at 681 (internal citation omitted).  In *Morgan v. Commissioner of Social Security Administration,* for example, the Ninth Circuit affirmed the ALJ's determination that the claimant's ability to fix meals, do laundry, work in the yard, and occasionally care for children was evidence of an ability to work.  169 F.3d 595, 600 (9th Cir. 1999).

Here, the ALJ found Plaintiff's activities of daily living were inconsistent with Plaintiff's allegations of chronic fatigue, pain, cognitive dysfunction, inability to concentrate, and sleeping twelve to sixteen hours per day.  For example, although Plaintiff alleged she was easily distracted, she testified she was able to maintain sufficient concentration to read for approximately two hours at a time and complete tasks.  In her function report, Plaintiff wrote that she could perform household cleaning (laundry, ironing) for one hour at a time, she could attend to her personal hygiene, she took care of her dogs and cats, prepared simple meals, grocery shopped, and drove on her own.  AR 181-84.  Additionally, she reported she was able to manage

her finances, leave the house two or three times per day, walk a mile, follow written and spoken instructions, attend church, and travel alone.  AR 184-87.  In addition, Dr. Villaflora observed that Plaintiff's symptoms and their severity were disproportionate to the objective medical evidence.  AR 486.

The court finds the ALJ enunciated clear, convincing, and specific reasons for rejecting Plaintiff's pain testimony, all of which were supported by the record as a whole.

**VI.    Conclusion**

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence reviewing the administrative record as a whole.  If the record will support more than one rational interpretation, the court must defer to the Commissioner's interpretation.  If the evidence can reasonably support either affirming or reversing the ALJ's decision, the court may not substitute its judgment for the ALJ's.  *Flaten*, 44 F.3d at 1457.  It is the ALJ's responsibility to make findings of fact, drawing reasonable inferences from the record as a whole, and to resolve conflicts in the evidence and differences of opinion.  Having reviewed the Administrative Record as a whole, and weighing the evidence that supports and detracts from the Commissioner's conclusion, the court finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g).  For all of the foregoing reasons,

**IT IS RECOMMENDED**:

1.    Plaintiff's Motion to Remand (Dkt. #25) be DENIED.

2.    The Commissioner's Cross-Motion to Affirm (Dkt. #29) be GRANTED.

DATED this 23rd day of June, 2014.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE